IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| WASHINGTON STATE ASSOCIATION OF MUNICIPAL ATTORNEYS, a Washington not for profit corporation, | No. 80266-6-I |
| Appellant, | DIVISION ONE |
| v. | UNPUBLISHED OPINION |
| WASHINGTON COALITION FOR OPEN GOVERNMENT, a Washington nonprofit corporation, | |
| Respondent, | |
| CITY OF SPOKANE VALLEY, CITY OF NEWCASTLE, CITY OF YAKIMA, CITY OF KENT, CITY OF VANCOUVER, CITY OF MARYSVILLE, CITY OF ELLENSBURG, CITY OF SEATTLE, CITY OF OLYMPIA, CITY OF BELLEVUE, and the Municipal Research and Services Center, a Washington nonprofit corporation, | |
| Third-Party Defendants. | |

SMITH, J. — The Washington Coalition for Open Government (WCOG) requested public records from the Washington State Association of Municipal Attorneys (WSAMA) about WSAMA's amicus brief activities. WSAMA, a private nonprofit organization, fulfilled the requests but sued for declaratory judgment that it is not an "agency" under the Public Records Act (PRA), chapter 42.56

Citations and pin cites are based on the Westlaw online version of the cited material.

RCW. WSAMA and WCOG each moved for summary judgment, and the trial court concluded that WSAMA is the functional equivalent of an agency and therefore subject to the PRA.

Applying the test from Telford v. Thurston County Bd. of Comm'rs, 95 Wn. App. 149, 157, 974 P.2d 886 (1999), we conclude that WSAMA's activities do not serve a core governmental function and are not primarily government funded. Furthermore, WSAMA is not governmental in origin, and on balance, the degree of governmental control over WSAMA does not establish that it is the functional equivalent of an agency for purposes of the PRA. Accordingly, we reverse.

BACKGROUND

In 1957, a group of municipal attorneys at the annual convention of the Association of Washington Cities (AWC) decided, with AWC's blessing, to form a committee of municipal attorneys.[1] This committee would prepare a constitution and bylaws for a new association of municipal attorneys. The new association, WSAMA, was subsequently formed for the purpose of

> "'maintaining and encouraging friendly and cooperative
> relationships among the various municipal attorneys representing
> the various classes of cities and towns within the State of
> Washington; to provide for the holding of meetings of such
> municipal attorneys for the discussion of common municipal
> problems, to the end that all cities and towns, and the attorneys
> thereof, may be aided and benefited by such discussions, resulting
> in uniform opinions upon common municipal problems and uniform
> interpretations of statutes involving such municipalities; and for the
> further purpose of establishing and maintaining a closer and more
> cooperative relationship between the cities and towns of the State
> and the courts, agencies, commissions, and other bodies interested
> in or dealing with or administering statutes, rules, and regulations
> concerning the municipalities.'"

---

[1] AWC is the functional equivalent of an agency for purposes of the PRA.

In 1986, WSAMA was formally incorporated as a private, nonprofit organization. Its statement of purpose remained substantially the same, with the additional statement that "the purpose of this corporation is primarily educational." All the incorporators were municipal attorneys, with the exception of one employee of the Municipal Research and Services Center (MRSC).

WSAMA has three different membership tiers: (1) general members, who serve "by election, appointment, employment, or contract" as an attorney or prosecutor for any city or town in Washington State, (2) honorary members, who have served for 25 years as a city attorney or prosecutor, and (3) associate members, who are attorneys or city officials but do not serve as attorneys for a Washington city. Associate members may join WSAMA's committees, but they are not entitled to serve on its board or vote. Thus, except for the secretary/treasurer, all WSAMA board members are either public city attorneys or private attorneys under contract with a city.

WSAMA's main activities are (1) hosting semiannual municipal law educational conferences that fulfill Continuing Legal Education (CLE) requirements for Washington lawyers and (2) advocating for municipal interests through the submission of amicus curiae briefs. An amicus committee reviews requests for amicus assistance, invites volunteers to author briefs, and reports to the WSAMA board. The amicus committee accepts requests if "[t]he legal issue involved is of substantial interest to WSAMA or to a number of cities or towns." If a Washington municipality would potentially be opposed to WSAMA's participation in the case, then the request is fielded to the board. The board then

3

asks if the legal issue involved is "critical to the substantial majority of cities or towns."

As of 2018, there were 14 people on the amicus committee. Six were employed by cities, and 8 were employed by private firms.[2] The amicus policy does not provide a specific procedure for conflicts checks. However, in practice, if a committee member's law firm or city has a conflict with an amicus brief request, that member is excluded from the discussion of whether to accept the request and from volunteering to help with the brief.

Most of WSAMA's budget centers on its two annual conferences, which account for about 91 percent of its revenue and about 92 percent of its expenses. About two-thirds of conference attendees at a recent conference worked for cities or towns, which potentially reimbursed their employees' registration costs. Membership dues account for about 9 percent of WSAMA's revenue. While WSAMA does not track whether members' employers pay their dues or conference registration, the record indicates that some cities reimburse their attorneys' membership fees, while others do not. Furthermore, at least some cities allow their attorneys to use their city e-mail accounts, computers, and other resources for WSAMA activities. However, not all WSAMA members do so.

WSAMA contracts with MRSC for administrative services, including accounting services, board administration, managing membership, and organizing conferences. WSAMA does not have office space or direct

---

[2] Of the eight private firm members, two were honorary members, one was a general member, and five were associate members.

employees, and it does not participate in any governmental benefit programs.

FACTS

In March 2018, a representative of WCOG sent a letter to WSAMA officers requesting records under the PRA "relating to any proposed amicus brief in any case involving the Public Records Act." The WSAMA president responded, noting that WSAMA does not consider itself an "agency" subject to the PRA, but that it would be fulfilling the requests "[t]o avoid any ambiguity." WSAMA provided WCOG with over 1,200 pages of responsive records. WSAMA also provided an exemption log, describing 15 e-mails and 16 draft pleadings which were withheld or redacted on the basis of work product and attorney-client privilege.

In May, WCOG objected to the listed exemptions and made a second public records request. WSAMA again replied that WSAMA did not consider itself an agency under the PRA but would provide the requested records regardless. The second request was completed on June 11. Also on June 11, WSAMA's attorney e-mailed regarding WCOG's objection to the exemption log, offering to discuss the records or submit them for in camera review. WCOG did not respond.

On August 24, 2018, WSAMA filed a complaint requesting declaratory judgment that WSAMA is not an "agency" subject to the PRA and that, regardless, the records in the exemption log were properly withheld from disclosure. WSAMA and WCOG both moved for summary judgment, and the trial court entered an order in favor of WCOG, finding that WSAMA is the

functional equivalent of an agency and therefore subject to the PRA. WSAMA appeals.

ANALYSIS

Standard of Review

"We review questions of statutory interpretation and summary judgment rulings de novo, considering the evidence and any reasonable inferences in a light most favorable to the nonmoving party." Shavlik v. Dawson Place, 11 Wn. App. 2d 250, 254, 452 P.3d 1241 (2019), review denied, 195 Wn.2d 1019 (2020). Furthermore, because summary judgment is appropriate only if there are no material issues of fact, we disregard the trial court's findings of fact on appeal. Telford, 95 Wn. App. at 157; State ex rel. Banks v. Drummond, 187 Wn.2d 157, 167, 385 P.3d 769 (2016). Finally, we "disregard unsupported argumentative assertions and conclusory statements in a summary judgment proceeding." Spokane Research & Def. Fund v. W. Cent. Cmty. Dev. Ass'n, 133 Wn. App. 602, 606, 137 P.3d 120 (2006).

Whether WSAMA is an Agency Under the PRA

WSAMA contends that it is not an agency under the PRA and, thus, that it is exempt from PRA record requests. We agree.

The PRA is "'a strongly-worded mandate for open government'" which we must liberally construe to "'ensure that the public's interest in [broad disclosure] is protected.'" Fortgang v. Woodland Park Zoo, 187 Wn.2d 509, 512, 387 P.3d 690 (2017) (alteration in original) (quoting Rental Hous. Ass'n of Puget Sound v. City of Des Moines, 165 Wn.2d 525, 527, 199 P.3d 393 (2009); Yakima County v.

Yakima Herald-Republic, 170 Wn.2d 775, 791, 246 P.3d 768 (2011)). The PRA requires "[e]ach agency, in accordance with public rules, [to] make available for public inspection and copying all public records." RCW 42.56.070(1).

The PRA defines agencies to include "all state agencies and all local agencies," which include, respectively, "every state office department, division, bureau, board, commission, or other state agency," and "every county, city, town, municipal corporation, quasi-municipal corporation, or special purpose district, or any office, department, division, bureau, board, commission, or agency thereof, or other local public agency." RCW 42.56.010(1). Private entities can be "agencies" under this definition if they are the "functional equivalent" of an agency. Fortgang, 187 Wn.2d at 517-18. Since Telford, Washington courts have weighed four criteria to determine whether an entity is the functional equivalent of an agency: "(1) whether the entity performs a government function, (2) the extent to which the government funds the entity's activities, (3) the extent of government involvement in the entity's activities, and (4) whether the entity was created by the government." Fortgang, 187 Wn.2d at 518. The Telford factors need not be satisfied equally. Instead, we consider whether "'the criteria on balance . . . suggest that the entity in question is the functional equivalent of a state or local agency.'" Fortgang, 187 Wn.2d at 518 (quoting Clarke v. Tri-Cities Animal Care & Control Shelter, 144 Wn. App. 185, 192, 181 P.3d 881 (2008)); Shavlik, 11 Wn. App. 2d at 256. Because the Telford factors on balance weigh against finding that WSAMA is a functional equivalent, we conclude that WSAMA is not an agency.

1. Government Function

The first Telford factor asks whether the entity performs core government functions. Fortgang, 187 Wn.2d at 524. An activity is a core government function if it is inherently governmental or "could not be delegated to the private sector." Fortgang, 187 Wn.2d at 524-25. Even if a private entity actually performs the function, a government function is nondelegable if the government must retain its responsibility to ensure that the governmental purpose is met. Clarke, 144 Wn. App. at 194. If enabling legislation permits an entity to exercise police or government administrative powers on behalf of the State, the entity is performing a nondelegable governmental function. Fortgang, 187 Wn.2d at 524-25; Clarke, 144 Wn. App. at 192-94 (where statute authorized cities to regulate animal control, including by contracting with private entities to exercise police powers for this purpose, an entity performing these duties pursuant to contract with cities was performing nondelegable government function); see also Telford, 95 Wn. App. at 163-64 (Associations of counties and county officials were performing core government functions where they existed pursuant to enabling legislation which declared the coordination of county administrative programs to be a public purpose.). Furthermore, if legislation defines an activity as inherently public, prevents it from being delegated to the private sector, or obligates the entity at issue to perform a function, this implicates a government function under Telford. Fortgang, 187 Wn.2d at 525.

Here, WSAMA's actions promote governmental interests, but they do not rise to the level of core government functions. WCOG acknowledges that no

legislation delegates authority to WSAMA and that WSAMA's activity of hosting CLE conferences is a common educational activity taken by private entities and is not a uniquely government function. However, WCOG contends that WSAMA's amicus activities are core government functions. While WSAMA's amicus briefs do promote cities' interests and regularly advocate for the same position advocated by the governmental party, the same is true of other private entities' amicus briefs. As an amicus, WSAMA has no control over the outcome of the case or even the scope of arguments before the court. See Noble Manor Co. v. Pierce County, 133 Wn.2d 269, 272 n.1, 943 P.2d 1378 (1997) (courts will not usually consider an issue raised only by amicus).[3]

Shavlik is instructive. In that case, Dawson Place employed child interview specialists to conduct forensic interviews with child victims pursuant to a contract with Snohomish County. Shavlik, 11 Wn. App. 2d at 262. Interviews were used in criminal investigations and prosecutions, and the specialists were required to work closely with prosecuting attorneys to develop cases. Shavlik, 11 Wn. App. 2d at 262. Despite the active role the specialists took in government proceedings, which they were able to take because of their contract with the county, the court determined that they were not performing nondelegable duties

---

[3] WSAMA's bylaws also indicate that it has a legislative committee which "provide[s] advice to the AWC on legislation of interest to cities and towns." This committee may coordinate the assistance of attorneys to testify before the legislature, but does not engage in lobbying. There is no information about the current activities of this committee in the record, and the parties have not addressed its activities or whether it performs a governmental function. Neither providing advice about proposed laws nor testifying to the legislature is a uniquely governmental function, so it is unlikely that this committee would affect the Telford analysis.

because they had "no control over investigatory and charging decisions" and uncontested evidence showed police could conduct investigations without their assistance. Shavlik, 11 Wn. App. 2d at 262-63.

Similarly, WSAMA takes a role in its amicus opinions that it is able to fill because of its relationship to Washington cities, but it has no control over the outcome of cases or what issues the court considers, and its participation is not necessary to the resolution of these cases. Thus, the first Telford factor weighs against finding that WSAMA is a public entity.

WCOG disagrees and asserts that filing briefs *on behalf of* the government is a government function which cannot be delegated to a private party. WCOG points to WSAMA's amicus policy and WSAMA's statements of interest in previous amicus briefs as evidence that WSAMA represents cities in its amicus activities. WSAMA's amicus policy considers the degree to which the issue is of interest to cities and towns, as well as whether any city or town would oppose WSAMA filing an amicus brief. In WSAMA's statements of interest in its amicus briefs, it has generally represented that its interest is tied to that of WSAMA members' client cities. For instance, one interest section explains:

> [WSAMA] is a nonprofit Washington corporation that provides education and training in the area of municipal law to attorneys who represent cities, towns and other local governments throughout the State of Washington. WSAMA also regularly participates as an *amicus curiae* in cases before this Court to advocate on behalf of municipal police powers, including the ability of cities[ ] and towns[ ] to apply their local land use and development regulations to all property within their respective jurisdictions, including property owned by state agencies. This brief supports these purposes.
> WSAMA has an interest in preventing state institutions of higher education from evading local development regulations on the basis of meritless, implied preemption claims.

10

In other briefs, WSAMA has claimed an interest because, for instance, a certain outcome "would call into question the tax structure in many Washington cities and would adversely affect their ability to provide vital public services" or a certain outcome would "subvert the appeal process for all of Washington's cities' and counties' quasi-judicial decisions."

WCOG is correct in that to the extent that WSAMA represents its interest in these cases as equivalent to the cities' interest, it is performing the governmental function of advocating on behalf of the government. Washington's rule permitting amicus briefs was intended to assist the court by allowing input from "those persons or groups who will be significantly affected by the outcome of the issues on review." 3 KARL B. TEGLAND, WASHINGTON PRACTICE: RULES PRACTICE RAP 10.6 task force cmt. at 109 (8th ed. 2014). It seems that based on its representations, WSAMA is permitted to participate as an amicus because it is in fact advocating on behalf of the government. However, a private party could be similarly concerned by these public issues and submit an amicus brief in favor of, for instance, the legitimacy of municipal taxes or the orderly implementation of appeals processes. Accordingly, the mere fact that WSAMA advocates for the interest of cities does not establish that its amicus briefs serve a core, nondelegable governmental function.

2. Government Funding

The second Telford factor concerns the extent to which the government funds the organization. Fortgang, 187 Wn.2d at 527. We consider both the percentage of funds that the entity receives from the government and the form

11

which that funding takes. Shavlik, 11 Wn. App. 2d at 264 (quoting Fortgang, 187 Wn.2d at 528). A fixed funding allocation, such as designated levy funds, weighs in favor of functional equivalence, while a fee-for-services model weighs against it. Fortgang, 187 Wn.2d at 528-29. We also consider in-kind support and other governmental benefits as evidence that an entity is publicly funded. See Telford, 95 Wn. App. at 165 (considering participation in public retirement system and insurance fund as evidence of public funding).

Here, WSAMA receives no funding directly from government sources. Its largest source of revenue is its annual conferences, at 91 percent. This revenue covers the cost of hosting the conferences. Even if some cities reimburse their attorneys' conference fees, these are still fees for services and thus do not lean toward a finding of functional equivalence. See Shavlik, 11 Wn. App. 2d at 265-66 (excluding fee-for-services income when calculating percentage of government funding).

Another 9 percent of WSAMA's funding is attributable to membership dues, some of which are reimbursed by cities. The portion of reimbursed dues, the value of which is not in the record, does not weigh toward functional equivalence like a fixed funding allocation would, because the record indicates funds for membership dues are distributed on a piecemeal, reimbursable basis. See Telford, 95 Wn. App. at 164 (explaining membership dues allocated directly from current county expense funds are a "block of public funds . . . diverted en masse" and so public should have access to records of how funds were spent). Thus, WSAMA's budget does not suggest that WSAMA is publicly funded.

However, we consider not only financial contributions but also in-kind support to determine whether an organization is publicly funded. Fortgang, 187 Wn.2d at 529 n.13. WCOG contends that WSAMA members use large amounts of "taxpayer-funded time, offices, computers, email accounts and other resources" for WSAMA amicus activities. The record does not establish that this is true. While most WSAMA members use their city or law firm e-mail addresses for WSAMA business, there is little evidence regarding the use of other city resources for WSAMA business. The evidence in the record is limited to some WSAMA e-mails sent during business hours and the statement of one WSAMA member whose employer city "permitted the use of city time and resources" for WSAMA amicus activities.[4] However, another WSAMA member reported that she does not do WSAMA work with city resources.

Overall, the value of the city resources used by WSAMA was not shown to be very high. There is no indication that WSAMA members' use of city e-mail comes at any cost to the cities. Indeed, Auburn's city policy authorizes the personal use of city computers, as long as there is no negative impact on the employee's performance of public duties and the direct measurable cost to the public is negligible. Many city resources are fixed costs, such as flat-rate Westlaw subscriptions or internet plans, which means that even if some WSAMA members use these resources, any measurable cost to the public is negligible.

---

[4] WCOG further argues that WSAMA members use their taxpayer-funded staff for WSAMA activities, but it cites only to WSAMA amicus briefs which were filed electronically to courts and to WSAMA memos by an attorney who kept his city's letterhead on the memos.

Furthermore, the contention that WSAMA members undertake amicus activities using taxpayer-funded time is unpersuasive. First, fewer than half of the amicus committee members are public employees. Second, the mere fact that committee members send e-mails during workdays does not establish a valuable contribution from their employers. For members who are paid by the hour, the record indicates that they do not bill their employers for WSAMA activities. As for members who are paid a salary to complete certain tasks, there is no indication that WSAMA activities ever overshadowed public job responsibilities, which would cause some cost to a municipality. Because attorneys may be expected to work odd hours, it is difficult to conclude that the cost of WSAMA members' time while doing WSAMA business "on the clock" is as significant as WCOG claims. In short, because WSAMA does not receive significant funding or in-kind support from the government, the second factor weighs against functional equivalence.

3. Government Control

The third Telford factor considers the degree to which the government controls the organization's "day-to-day operations." Fortgang, 187 Wn.2d at 530.

Telford is instructive. Telford discussed whether the Washington State Association of Counties (WSAC) and the Washington State Association of County Officials (WACO) were public agencies. 95 Wn. App. at 151. The court noted that while "there is no outside government control of WACO and WSAC . . . the associations themselves are completely controlled by elected and appointed county officials. There is no private sector involvement or

14

membership." Telford, 95 Wn. App. at 165. For this reason, the court concluded that the third factor weighed toward a finding that WACO and WSAC were the functional equivalent of agencies. Telford, 95 Wn. App. at 165.

Here, as in Telford, there is no government entity that controls WSAMA's actions and no evidence that any government entity oversees WSAMA's actions. Also as in Telford, the organization is run by public employees, with the exception in this case of city attorneys who work for private firms. Only attorneys for cities or towns can be general members, and only general members have the power to elect officers and directors or serve in these positions. Furthermore, the record indicates that it is normal for WSAMA to have one or two board members who work for private law firms with a city as a client, while the remaining board members are public employees. However, all classes of members, including private employees, can be members of standing committees. Indeed, only 7 out of 14 members of the amicus committee, which oversees WSAMA's most governmental activity, are general members, and only 6 of those are publicly employed. The record also indicates that all amicus committee members get equal input as to whether WSAMA should submit an amicus brief.

Thus, WSAMA is similar to the organizations in Telford in that it is primarily run by public employees, both in the general membership and in positions of leadership. The board is almost entirely public employees, and the board controls the activities of the organization. However, unlike in Telford, private citizens often have significant control over WSAMA's day-to-day affairs by serving on its committees. This involvement weighs against functional

equivalence. See Fortgang, 187 Wn.2d at 531 (focusing on day-to-day operations better serves the PRA's purpose of "preventing governments from operating (as governments) in secrecy"). Accordingly, we conclude that the third factor is equally balanced for and against the determination that there is functional equivalence.

### 4. Origin of the Entity

Finally, under the fourth Telford factor, we ask whether government action created the organization. Fortgang, 187 Wn.2d at 531. We consider whether the entity was created by special legislation and whether public officials formed the organization while acting in their official capacities and in furtherance of public business. Shavlik, 11 Wn. App. 2d at 269; Telford, 95 Wn. App. at 165. However, it is not sufficient that government employees were involved in an entity's creation for this factor to weigh toward functional equivalence. Shavlik, 11 Wn. App. 2d at 268-69.

Once again, Telford is instructive. As discussed in Telford, WSAC grew out of the County Commissioners Association, which had its first convention in 1906. Telford, 95 Wn. App. at 152. In 1939, the legislature formally declared the coordination of county administrative programs to be a public necessity and imposed on the counties several requirements and powers in the furtherance of this goal, including designating the association of county commissioners as a coordinating agency for these purposes. Telford, 95 Wn. App. at 153. When WSAC was incorporated as a nonprofit corporation, its purpose under its articles of incorporation included (1) "'the coordination of county administrative

programs,'" (2) "'the creation of more practical and efficient county legislation, administration and procedures,'" and (3) "'a general improvement in the conduct of county administrative government in accordance with the provisions of Chapter 188, Laws of Washington, 1939.'" Telford, 95 Wn. App. at 153-54.

The other entity discussed in Telford had a similar origin. WACO grew out of an older organization, and after the legislature imposed duties on county officials to coordinate their actions, Washington's county officials incorporated WACO to fulfill these duties. Telford, 95 Wn. App. at 154-55. Furthermore, the court noted that all county officials are members of the associations, as "they could hardly carry out their statutory duties in any other way." Telford, 95 Wn. App. at 165. Thus, the officials who created WACO and WSAC were acting in their official capacities in the furtherance of county business, as recognized and affirmed by the legislature before the organizations were incorporated. Telford, 95 Wn. App. at 165. For these reasons, the court concluded that the fourth factor weighed in favor of functional equivalence.

The early origins of WSAMA are similar to those of WSAC and WACO: in this case, a group of city attorneys met at an AWC convention, and WSAMA developed from that group. However, the events leading to WSAMA's incorporation differ from those described in Telford. The legislature did not direct WSAMA to form. Unlike Telford, not all municipal attorneys are members of WSAMA, because WSAMA was not created to enable municipal attorneys to do their job. Indeed, WSAMA was incorporated under bylaws that state the organization is primarily educational. Although WSAMA shares many

17

characteristics with the organizations in <u>Telford</u>, the record does not establish that WSAMA's origin is governmental in nature. We conclude this factor weighs against a finding of functional equivalence.

     5.  <u>Balancing of Factors</u>

In balancing the factors, we hold that WSAMA is not the functional equivalent of an agency under the PRA. The goal of the <u>Telford</u> test is to "prevent the government from operating in secrecy via a private surrogate." <u>Fortgang</u>, 187 Wn.2d at 532. Accordingly, no Washington case has held that an entity is the functional equivalent without finding that the entity was government funded and controlled and was serving a core government function. <u>Fortgang</u>, 187 Wn.2d at 533; <u>Spokane Research</u>, 133 Wn. App. at 609-10; <u>Telford</u>, 95 Wn. App. at 165-66; <u>Cedar Grove Composting, Inc. v. City of Marysville</u>, 188 Wn. App. 695, 720, 354 P.3d 249 (2015); <u>Shavlik</u>, 11 Wn. App. 2d at 269; <u>McKee v. Paratransit Servs.</u>, 13 Wn. App. 2d 483, 495, 466 P.3d 1135 (2020); <u>Clarke</u>, 144 Wn. App. at 194-95; <u>Freedom Found. v. SEIU Healthcare Nw. Training P'ship</u>, No. 76319-9-I, slip op. at 20-26 (Wash. Ct. App. Aug. 27, 2018) (unpublished), http://www.courts.wa.gov/opinions/pdf/763199.pdf. Here, none of these factors establish that WSAMA is functionally governmental. Thus, WSAMA "does not implicate the problem that the <u>Telford</u> test was designed to protect against: governments operating in secret through private entity surrogates." <u>Fortgang</u>, 187 Wn.2d at 533.

WCOG contends that members pursue WSAMA activities in the scope of their employment with Washington municipalities and that this establishes that

18

WSAMA is functionally governmental. However, even if we assume most members undertake WSAMA activities as part of their employment with a city, this would not establish that WSAMA itself is an agency. Instead, this would establish that records used or created by the member would become the employer city's records. Nissen v. Pierce County, 183 Wn.2d 863, 876, 357 P.3d 45 (2015). As our Supreme Court has explained, these records would be subject to public records requests made to the city. Nissen, 183 Wn.2d at 877. While the concept of scope of employment may be relevant to the analysis of some of the Telford factors, it is not itself a factor that determines the characterization of an organization.

WCOG made several PRA requests regarding WSAMA to board members' cities, and the requests were all fulfilled. While WCOG notes this is a less efficient way to access WSAMA records, this inefficiency only matters if WCOG has a right to access WSAMA records independent of a given city's participation. Because WSAMA is not an agency subject to the PRA, WCOG does not have this right. Accordingly, we reverse and grant summary judgment in favor of WSAMA.

Attorney Fees

WSAMA contends that the award of WCOG's attorney fees below was improper. We agree.

"Whether a party is entitled to an award of attorney's fees is a question of law and is reviewed on appeal de novo." Durland v. San Juan County, 182 Wn.2d 55, 76, 340 P.3d 191 (2014). Generally, an award of attorney fees must

be "authorized by contract, statute, or recognized ground of equity." <u>Durland</u>, 182 Wn.2d at 76.

Here, the trial court awarded WCOG attorney fees under RCW 42.56.550(4), which provides that "[a]ny person who prevails against an agency in any action in the courts seeking the right . . . to receive a response to a public record request . . . shall be awarded all costs, including reasonable attorney fees, incurred in connection with such legal action." But because WCOG should not have prevailed, it is not entitled to these costs.

As a final matter, WCOG requests attorney fees on appeal under RCW 42.56.550(4) and RAP 18.1. Because WCOG does not prevail on appeal, we deny its request.

We reverse.

_____

WE CONCUR:

_____         _____

20